UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------X

RAYMOND DOWNING and STUDIO
MACBETH, INC.,

                       Plaintiffs,

      -against-

A&E TELEVISION NETWORKS, LLC,
and DIVISA RED SAU d/b/a DIVISA
HOME VIDEO,

                       Defendants.
---------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  September 10, 2021

20-CV-4747 (KMW)

**OPINION & ORDER**

KIMBA M. WOOD, United States District Judge:

      Plaintiffs Ray Downing and Studio Macbeth, Inc., ("Macbeth") bring this action against Defendants A&E Television Networks, LLC, ("AETN") and Divisa Red SAU ("Divisa"), alleging copyright infringement in relation to two Spanish-language television programs on the History en Español channel. Defendant AETN asserts that this suit is foreclosed by a prior agreement to arbitrate such disputes, and has moved to compel arbitration and stay proceedings. For the reasons set forth below, AETN's motion to compel arbitration of Plaintiffs' claims against AETN is GRANTED and all proceedings are stayed pending arbitration.

## BACKGROUND

      Ray Downing is an artist specializing in three-dimensional computer graphics, and the founder, owner, and operator of Macbeth, a firm engaged in this type of graphics work. (First Downing Decl. ¶¶ 1–2, ECF No. 33.) AETN is a television network whose primary business is to operate television channels including the History Channel and History en Español and offer access to its content library through sub-licensing arrangements on other channels and consumer

purchases of digital downloads or DVDs.  (*Id.* ¶¶ 5, 7, 16.)  Divisa is a Spanish company engaged in the sale and production of Spanish-language videos.  (*See id.* ¶¶ 36–39; Compl. ¶ 10, ECF No. 1.)

The parties' engagement began in 2008, when an AETN executive inquired about using graphics created by Macbeth for a documentary regarding President Abraham Lincoln.  (*Id.* ¶ 7.)  Macbeth began collaborating in 2009 with Left/Right, Inc., ("Left/Right"), a production company creating the planned documentary for AETN.  (*Id.* ¶ 8.)  Over the following one and a half years, Macbeth granted licenses to Left/Right for the use of a number of Macbeth's works in three programs created for AETN: *Stealing Lincoln's Body*, *The Real Face of Jesus*, and *Jesus: The Lost 40 Days*.  (*Id.* ¶¶ 8, 13–14, 17–18.)  After Downing's working relationship with Left/Right soured, he and Macbeth filed suit in 2012 against AETN and Left/Right, alleging copyright infringement for unauthorized uses of Macbeth's materials in the three original programs.  (*See id.* ¶ 19; Seibel Decl., Exs. A, B, ECF No. 27.)

To resolve the 2012 litigation, Macbeth, Ray Downing, and Maria Downing entered into a settlement agreement with AETN and Left/Right on July 23, 2014 (the "2014 Agreement").  This agreement granted to AETN and Left/Right a perpetual license

> to use any and all materials created by Macbeth (the "Macbeth Materials") for each of *Stealing Lincoln's Body*, *The Real Face of Jesus*, and *Jesus: The Lost 40 Days*, as those Macbeth Materials already have been included in the three respective programs, including but not limited to the right to publicly perform, transmit . . . or use the Programs.

(Seibel Decl., Ex. C ¶ 3.)  The contract also had a mutual release provision, by which Macbeth and the Downings released AETN from all claims and causes of action "known or unknown, that arose or may have arisen prior to the date of this Agreement."  (*Id.* ¶ 7.)  An arbitration clause in the 2014 Agreement provided that "[t]he Parties agree that any disputes

2

regarding the enforcement, interpretation, or effect of this Settlement Agreement will be submitted to arbitration through JAMS, The Resolution Experts ("JAMS") . . . for binding arbitration pursuant to JAMS rules[.]"  (*Id.* ¶ 14.)

While the 2014 Agreement put an end to the earlier litigation, it paused the parties' intellectual property disputes only temporarily.  After AETN aired a new program in early 2017, *The Face of Jesus Uncovered?*, which contained materials created by Macbeth that had appeared in *The Real Face of Jesus*, Macbeth's counsel wrote to AETN asserting claims for copyright infringement.  (Seibel Decl., Ex. D, at 1.)  AETN and Macbeth entered into a second settlement agreement in June 2018 to resolve these claims.  (*See id.* at 1, 10.)  One provision clarified the parties' understanding that the license in the 2014 Agreement "authorizes AETN to air each of the three programs as is or with non-material edits, including but not limited to edits to shorten or lengthen the program to fit current scheduling requirements, but does not authorize airing the programs with material edits."  (*Id.* ¶ 9.)  Each party again released the other of liability, this time covering any "claim or potential claim related in any way to" the 2012 litigation, 2014 Agreement, copyright claims asserted in the 2017 letter, or *The Face of Jesus Uncovered?*.  (*Id.* ¶ 3.)  The contract included an arbitration clause nearly identical to the one found in the 2014 Agreement.  (*See id.* ¶ 10.)

The peace bought by the second settlement did not last.  In October 2019, Macbeth's counsel sent a letter asserting that AETN's airing of *El Verdadero Rostro de Jesús* and *Los 40 Días Ignorados de Jesús* during the November 2016 re-launch of the History en Español channel infringed Macbeth's copyrights by using sixty-four of Macbeth's materials without the studio's consent.  (*See* Seibel Decl., Ex. E, at 3.)  Plaintiffs Macbeth and Downing filed suit in the U.S. District Court for the Southern District of New York in June 2020 alleging one count of

copyright infringement under 17 U.S.C. § 501 against AETN and its purported Spanish-language partner, Divisa.[1]  (Compl. ¶ 24.)  Defendant AETN has moved to compel arbitration and stay proceedings pending arbitration.  (ECF No. 25.)

## LEGAL STANDARD

The Federal Arbitration Act requires courts to enforce arbitration agreements according to their terms, "save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2; *see Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 67 (2010).  Still, "[a]rbitration is strictly a matter of consent, and thus is a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration."  *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299 (2010) (internal quotation marks, citations, and emphasis omitted).  Such agreements to arbitrate disputes are construed under state contract law.  *See Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 73–74 (2d Cir. 2017).

When adjudicating a motion to compel arbitration, "courts apply a standard similar to that applicable for a motion for summary judgment," considering "all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . affidavits" and "draw[ing] all reasonable inferences in favor of the non-moving party."  *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016) (internal quotation marks and citations omitted).  Courts in this circuit undertake a two-part

---

[1] Plaintiffs once again assert that the two Spanish-language programs exploited sixty-four copyrighted works but, in contrast to the 2019 assertion that all of the violated copyrights were held by Macbeth, now list as relevant one copyright held in Downing's name alone.  (Compl. ¶¶ 18, 21.)  It is unclear precisely to which copyright Plaintiffs refer.  The complaint states that Downing's copyright is registered under the number PAu-3-640-355, (*id.* ¶ 18), but also that it is titled "The Missing 40 Days," which corresponds to a different copyright, with registration number PAu 3-640-339 (Second Downing Decl., Ex. A, at 12, ECF No. 36.)  In any event, both copyrights were initially subjects of the 2012 litigation.  (Seibel Decl., Ex. A ¶¶ 478–79.)

inquiry to determine whether a particular dispute is subject to arbitration, assessing "(1) whether the parties have entered into a valid agreement to arbitrate, and, if so, (2) whether the dispute at issue comes within the scope of the arbitration agreement." *In re Am. Express Fin. Advisors Sec. Litig.*, 672 F.3d 113, 128 (2d Cir. 2011). The second prong includes an antecedent step of ascertaining who is to decide whether the parties agreed for the dispute to be resolved in arbitration: the court or an arbitrator. Such "threshold questions of arbitrability presumptively should be resolved by the court and not referred to the arbitrator" unless there is evidence that "the parties clearly and unmistakably agree[d] to arbitrate threshold questions such as whether the arbitration clause applies to a particular dispute." *Doctor's Assocs., Inc. v. Alemayehu*, 934 F.3d 245, 250–51 (2d Cir. 2019) (internal quotation marks omitted).

## DISCUSSION

### I. Arbitration

AETN argues that Downing and Macbeth agreed in the 2014 and 2018 Agreements to delegate to an arbitrator the question of whether future disputes were to be resolved in binding arbitration. In the alternative, it asserts that a court reaching the merits of the arbitrability question must find that copyright claims are within the scope of the parties' agreements to arbitrate. Plaintiffs counter that qualifying language in the arbitration clauses creates ambiguity as to who should resolve the question of arbitrability and that the failure to identify the Spanish-language programs within the Agreements makes the claims in this case not arbitrable. Because the parties evinced "clear and unmistakable" intent that an arbitrator decide the question of whether Plaintiffs' claims are subject to arbitration, the Court grants the motion to compel arbitration and declines to reach the merits of that question.

**A. Agreement to Arbitrate**

The first prong of this inquiry is easily satisfied as to the disputes between each plaintiff and AETN. Each plaintiff has at least one valid agreement to arbitrate with AETN: Downing agreed to arbitrate disputes pursuant to the 2014 Agreement, while Macbeth agreed to arbitrate in both the 2014 and 2018 Agreements. In contrast, no party argues that the other defendant, Divisa, has entered into an agreement to arbitrate disputes. Plaintiffs' claims against Divisa are thus addressed below only in connection with the motion for stay of proceedings.

In assessing whether parties have agreed to arbitrate disputes between them, "courts . . . must give effect to the contractual rights and expectations of the parties. In this endeavor, as with any other contract, the parties' intentions control." *Holick v. Cellular Sales of N.Y., LLC*, 802 F.3d 391, 395 (2d Cir. 2015) (quoting *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 682 (2010)). Both agreements are construed under New York law. (*See* Seibel Decl., Ex. C ¶ 17, Ex. D ¶ 13.)

Both Plaintiffs were parties to the 2014 Agreement with Defendant AETN, which provides that "[t]he Parties agree that any disputes regarding the enforcement, interpretation, or effect of this Settlement Agreement will be submitted to arbitration . . . pursuant to JAMS rules[.]" (Seibel Decl., Ex. C ¶ 14.) The validity of this agreement and its arbitration clause is unquestioned. The 2018 Agreement contains a nearly identical arbitration clause. (Seibel Decl., Ex. D ¶ 10.) The signatories to this contract, however, were only Studio Macbeth on one hand and AETN on the other—Downing's signature is on the document only in his representative capacity as president of Macbeth, rather than as a party to the contract. (*Id.* at 11.) AETN asserts that Downing is nevertheless bound to arbitrate pursuant to the 2018 Agreement under two of the five recognized theories of contract and agency law by which courts will compel an

6

unwilling nonsignatory to arbitrate: estoppel and agency.  *See Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995) (listing the five theories).

Estoppel of an unwilling nonsignatory's attempts to avoid arbitration is appropriate when the nonsignatory has "knowingly exploited" an agreement containing an arbitration clause and thereby accepted a "direct benefit" of the agreement.  *Gater Assets Ltd. v. AO Moldovagaz*, 2 F.4th 42, 68 (2d Cir. 2021) (quoting *MAG Portfolio Consult, GMBH v. Merlin Biomed Grp. LLC*, 268 F.3d 58, 62 (2d Cir. 2001).  The fact that Downing is among the "parents, subsidiaries, . . . officers, directors, employees, insurers, [and] attorneys" released by AETN from liability for past conduct, (Seibel Decl., Ex. D ¶ 3(a)), does not demonstrate that Downing knowingly exploited the 2018 Agreement, *cf. Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S.*, 9 F.3d 1060, 1064 (2d Cir. 1993) (holding a nonsignatory affiliate must arbitrate after knowingly using a trade name as permitted by a settlement agreement signed by its parent association).  Nor does AETN identify any authority supporting its contention that a payment to an entity owned by a nonsignatory is a direct benefit sufficient for estoppel when the contract did not "expressly provide" this benefit to Downing.  *Trina Solar US, Inc. v. Jasmin Solar Pty Ltd*, 954 F.3d 567, 572 (2d Cir. 2020).  Indeed, past decisions in this district suggest the opposite.  *See WTA Tour, Inc. v. Super Slam Ltd.*, 339 F. Supp. 3d 390, 401 (S.D.N.Y. 2018) (Rakoff, J.) (stating that "mere ownership" of signatory does not compel nonsignatory to arbitrate); *see also Kwatinetz v. Mason*, 356 F. Supp. 3d 343, 351–52 (S.D.N.Y. 2018) (Koeltl, J.).

The movant's assertion that Downing is bound under "traditional principles of agency law," (Br. at 7, ECF No. 26), is no more compelling.  It is well-settled under those principles that "[a]n agreement to arbitrate does not bind an agent acting on behalf of a disclosed principal 'unless there is clear and explicit evidence of the agent's intention to substitute or superadd his

7

personal liability for, or to, that of his principal.'" *Moneygram Payment Sys., Inc. v. Consorcio Oriental, S.A.*, No. 05-CV-10773, 2007 WL 1489806, at *6 (S.D.N.Y. May 21, 2007) (Berman, J.) (citing *Lerner v. Amalgamated Clothing & Textile Workers Union*, 938 F.2d 2, 5 (2d Cir. 1991)); *see also Savoy Rec. Co. v. Cardinal Exp. Corp.*, 203 N.E.2d 206, 207 (N.Y. 1964). AETN offers no evidence of such an intention. Thus, even though the non-movants did not address this argument explicitly in their opposition brief, AETN has failed to meet its burden to show that Downing is bound to arbitrate pursuant to the 2018 Agreement based on agency principles. Because neither theory is applicable on the facts as alleged, Downing may be compelled to arbitrate, if at all, under the 2014 Agreement, while Macbeth might be bound to arbitrate under either of the 2014 and 2018 Agreements.

### B. Intent that an Arbitrator Decide the Question of Arbitrability

The second prong of the inquiry regarding this motion to compel arbitration contains two sequential steps. Before a court reaches the question of whether the copyright dispute between the parties must be decided through arbitration, known as the "arbitrability" of the dispute, there is a prior question of who is to decide that question of arbitrability: the court or an arbitrator. This inquiry is a matter of contract: "Just as the parties may elect through their contract to have arbitrators (rather than a court) resolve categories of disputes between them, they may similarly contract to have arbitrators (rather than a court) decide whether a particular dispute is to be arbitrated under the terms of the contract." *Metro. Life Ins. Co. v. Bucsek*, 919 F.3d 184, 189–90 (2d Cir.), *cert. denied*, 140 S. Ct. 256 (2019). If a court determines that the parties agreed to delegate the question of arbitrability to an arbitrator, its analysis must go no further.

Because they establish whether the arbitrator in fact has authority over the parties, "threshold questions of arbitrability presumptively should be resolved by the court and not referred to the arbitrator." *Doctor's Assocs.*, 934 F.3d at 250 (citing *First Options of Chicago,*

*Inc. v. Kaplan*, 514 U.S. 938, 944–45 (1995)).  This presumption is overcome with a showing of "clear and unmistakable evidence" that the parties intended for an arbitrator to decide whether a dispute is arbitrable.  *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 530 (2019) (internal quotation marks omitted).  Because it is rare for arbitration agreements to specify expressly who is to decide the question of arbitrability,[2] *see Bucsek*, 919 F.3d at 191, courts typically infer parties' intent by looking to whether the contract contains provisions such as "(i) broad language expressing an intention to arbitrate all aspects of all disputes; (ii) the incorporation by reference of arbitration rules that empower an arbitrator to decide issues of arbitrability; and (iii) the waiver of the right to seek remedies in court."  *Citadel Servicing Corp. v. Castle Placement, LLC*, 431 F. Supp. 3d 276, 285 (S.D.N.Y. 2019) (Failla, J.) (citing *Bucsek*, 919 F.3d at 190–92).  Incorporation of an arbitral institution's rules that provide for second-order arbitrability, along with a broad arbitration clause, is sufficient to constitute "clear and unmistakable evidence" of the parties' intent to delegate the question of arbitrability to an arbitrator.  *DDK Hotels, LLC v. Williams-Sonoma, Inc.*, 6 F.4th 308, 319–20 (2d Cir. 2021).

In this case, there is no question that the 2014 Agreement and 2018 Agreement incorporated the arbitral rules of JAMS, (Seibel Decl., Ex. C ¶ 14, Ex. D ¶ 10), or that Rule 11(b) of the JAMS Comprehensive Arbitration Rules & Procedures provides that "arbitrability disputes . . . shall be submitted to and ruled on by the Arbitrator" (*id.* Ex. F, at 6.)  Both settlement agreements' arbitration clauses also contain language that is emblematic of a broad arbitration agreement: "any disputes regarding the enforcement, interpretation, or effect of this

---

[2] Despite Downing and Macbeth's suggestion, (Opp'n at 18, ECF No. 32), the arbitration agreement's inclusion of a passage granting remedial powers to the arbitrator does not serve expressly to exclude all other powers including that of deciding the question of arbitrability.  This reading would require an implausible construction of the arbitration agreement as intending to send certain disputes to an arbitrator for adjudication and yet denying the arbitrator the power to adjudicate the merits of those disputes.

9

Settlement Agreement will be submitted to arbitration through JAMS." (*Id.* Ex. D ¶ 10; *see also id.* Ex. C ¶ 14.)  This language is equivalent to contractual language that this Circuit has considered to create a broad arbitration clause.  *See, e.g.*, *Contec Corp. v. Remote Sol., Co.*, 398 F.3d 205, 208 (2d Cir. 2005) (holding agreement to arbitrate "any controversy arising with respect to this Agreement" left "no doubt" that "any disputes with the Agreement's other signatory" must be arbitrated); *Shaw Grp. Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 120–21 (2d Cir. 2003) (discerning a "clear and unmistakable intent to submit questions of arbitrability to arbitration" from the parties' agreement to arbitrate "[a]ll disputes . . . concerning or arising out of this Agreement"); *Collins & Aikman Prod. Co. v. Bldg. Sys., Inc.*, 58 F.3d 16, 20 (2d Cir. 1995) ("The clause in this case, submitting to arbitration '[a]ny claim or controversy arising out of or relating to th[e] agreement,' is the paradigm of a broad clause."); *but see Cheng v. HSBC Bank USA, N.A.*, 467 F. Supp. 3d 46, 53 (E.D.N.Y. 2020) (distinguishing between claims that "relate to" a contracted-for service and those "regarding" the service when the contract was one of several agreements between the parties).

    Contrary to Plaintiffs' arguments, the specification that the arbitration clauses apply to disputes "regarding" the enforcement, interpretation, or effect of the Agreements neither creates ambiguity as to whether the parties intended an arbitrator to decide questions of arbitrability nor transforms the clauses into "narrow" arbitration agreements.  The Second Circuit recently explained that "where there is a qualifying provision (whether described as a carve-out or carve-in) that arguably excludes the present dispute from the scope of the arbitration agreement, that provision creates ambiguity regarding the parties' intent to delegate arbitrability to the arbitrator."  *DDK Hotels*, 6 F.4th at 322.  This is not such a case.  First, the "qualifying provisions" that the Circuit's decisions have analyzed in this way have been found in contracts

that clearly contemplate that one subset of claims relating to the contract will be sent to arbitration, while, for another subset of claims, the contract either immunizes the parties against liability or refers disputes to a court or other non-arbitral adjudicator. *See DDK Hotels*, 6 F.4th at 322–23; *NASDAQ OMX Grp., Inc. v. UBS Sec., LLC*, 770 F.3d 1010, 1031–32 (2d Cir. 2014); *Katz v. Feinberg*, 290 F.3d 95, 97 (2d Cir. 2002).

Second, it would not be possible to resolve Plaintiffs' claims without regard to the "interpretation or effect" of the 2014 Agreement. The crux of Plaintiffs' copyright claim is that "AETN and Divisa used Plaintiffs' Copyrighted Materials . . . without a license." (Opp'n at 11.) Interpretation of the license that the 2014 Agreement grants to AETN, permitting a "perpetual, nonexclusive worldwide license" to use numerous materials protected by Macbeth's copyrights "as those Macbeth Materials already have been included in" *Stealing Lincoln's Body*, *The Real Face of Jesus*, and *Jesus: The Lost 40 Days*, is unavoidable in this inquiry. (Seibel Decl., Ex. C ¶ 3); *see Kamakazi Music Corp. v. Robbins Music Corp.*, 684 F.2d 228, 231 (2d Cir. 1982) (agreeing, in an analogous case, that the "Copyright Act claims . . . required interpretation of the contract"). Additionally, if any allegedly infringing activities took place before July 23, 2014, then the effect of Downing and Macbeth's release in the 2014 Agreement of AETN from liability for any claims "known or unknown" that may have arisen prior to that date would be central to a determination of liability. (*See* Seibel Decl., Ex. C ¶ 7.) While the dates of the alleged misconduct are not clear in the vaguely worded Complaint, (Compl. ¶¶ 20–21), the 2012 and 2013 copyright dates next to Divisa's name on the packaging for the allegedly infringing programs suggest that at least some of the conduct occurred prior to July 2014 (*see* Second Downing Decl. ¶¶ 39, 57, ECF No. 36.)

11

Furthermore, Plaintiffs' argument that the arbitration clauses are narrow because they use the word "regarding" relies on district court decisions that are readily distinguishable. The central decision that Plaintiffs use to support this proposition, *Cheng v. HSBC Bank USA, N.A.*, states that an "arbitration clause is broad if the language of the clause, taken as a whole, evidences the parties' intent to have arbitration serve as the primary recourse for disputes connected to the agreement containing the clause . . . [and] narrow, if the arbitration was designed to play a more limited role in any future dispute." 467 F. Supp. 3d at 51 (internal quotation marks omitted). Yet in *Cheng*, the plaintiff had signed both a Service Agreement authorizing electronic balance transfers to his account, which contained an arbitration clause, and a Master Agreement generally governing his deposit account with the bank, which did not. *Id.* at 49. The plaintiff's complaint "t[ook] issue with defendant's interpretation of the Master Agreement"—which not only failed to require arbitration but also had a jury waiver clause that "would be anomalous" without an understanding that some disputes were to be litigated in court. *Id.* at 51, 53. Similar disanalogies apply to the rest of the decisions cited by Plaintiffs. *See Borecki v. Raymours Furniture Co.*, No. 17-CV-1188, 2017 WL 5953172, at *1–3 (S.D.N.Y. Nov. 28, 2017) (Kaplan, J.) (holding an arbitration clause to be narrow when it covered disputes related to goods purchased from a furniture store and the plaintiff asserted violations of the Telephone Consumer Protection Act); *Duafala v. Globecomm Sys. Inc.*, 91 F. Supp. 3d 330, 335 (E.D.N.Y. 2015) (holding an arbitration clause to be narrow when contract provided for arbitration only of disputes regarding earnings calculations and for judicial determination of other claims); *see also Bellevue v. Exxon Mobile Corp.*, No. 19-CV-652, 2019 WL 1459041, at *3 (E.D.N.Y. Apr. 2, 2019) (describing an arbitration clause as being "as broad as lawyers could

make it" despite qualifying language limiting coverage to disputes "arising out of or related to your account, a previous related account or our relationship").³

Because the 2014 Agreement shows Downing and Macbeth's clear and unmistakable intent to send to an arbitrator the question of the arbitrability of their disputes with AETN, a full examination of the 2018 Agreement's clause is unnecessary. It bears noting, however, that the language of that clause is quite broad, covering any "claim or potential claim related in any way to" the 2012 litigation, 2014 Agreement, 2017 allegations of copyright infringement, or *The Face of Jesus Uncovered?*, (Seibel Decl., Ex. D ¶ 3(a)), and unquestionably would provide for arbitration of any claims between Macbeth and AETN. Having established that the arbitrability of Plaintiffs' copyright claims against AETN must be decided by an arbitrator, it remains only to dispose of the proceedings in this Court against both AETN and Divisa.

## II.     Stay of Proceedings

Judicial proceedings regarding claims referred to arbitration must be stayed upon request. *See Katz v. Cellco P'ship*, 794 F.3d 341, 347 (2d Cir. 2015). For any other, non-arbitrable disputes, the court "must then decide whether to stay the balance of the proceedings pending arbitration," *JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 169 (2d Cir. 2004), "a matter largely within the district court's discretion to control its docket," *Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 856 (2d Cir. 1987) (internal citation omitted). In making this decision, the "Court must balance several factors, . . . [including] the desirability of avoiding piecemeal litigation and the degree to which the cases necessitate duplication of discovery or issue

---

³ The Plaintiffs also reference *Fasano v. Guoqing Li*, 482 F. Supp. 3d 158 (S.D.N.Y. 2020) (Failla, J.). A forum selection dispute, such as that one, does not implicate the same concerns raised by the question of whether an arbitrator is to determine the arbitrability of a dispute.

resolution." *Morelli v. Alters*, No. 19-CV-10707, 2020 WL 2306445, at *4 (S.D.N.Y. May 8, 2020) (Woods, J.) (internal quotation marks omitted).

A stay is appropriate in this case given the degree of overlap in the copyright claim as against AETN and as against Divisa.  For both, the claim requires assessing the same two television programs to determine whether they contain materials copyrighted by Plaintiffs and finding that Plaintiffs did not grant permission for this use—and the Complaint does not distinguish between Defendants in their alleged infringements or the injuries that they allegedly caused to Plaintiffs.  Plaintiffs' arguments that the two Defendants' potential liability is "necessarily entwined," (Opp'n at 25), serves to emphasize that a stay would be appropriate, as "there is significant factual overlap between the remaining claims and the arbitrated claims," *Winter Invs., LLC v. Panzer*, 14-CV-6852, 2015 WL 5052563, at *11 (S.D.N.Y. Aug. 27, 2015) (Failla, J.) (collecting cases).  Moreover, Plaintiffs apparent languor in effectuating service on Divisa leads one to doubt that Plaintiffs will be unduly prejudiced by a stay of judicial proceedings pending the resolution of arbitration.[4]

## CONCLUSION

For the foregoing reasons, AETN's motion to compel arbitration of Plaintiffs' claims is GRANTED as to AETN.  AETN's motion to stay proceedings is GRANTED and proceedings as to all Defendants are stayed pending arbitration.  Plaintiffs request for oral argument is DENIED.

---

[4] As a foreign defendant, Divisa is not subject to Federal Rule of Civil Procedure 4(m)'s ninety-day time limit for service.  The Court notes, though, that Plaintiffs state that they "commenced" service on Divisa under the Hague Convention on August 21, 2020.  (ECF No. 19, at 1.)  Once six months have passed without the relevant country's central authority effectuating service, Article 15 of the Hague Convention permits litigants to resort to "alternative methods" of service pursuant to Rule 4(f)(3).  Fed. R. Civ. P. 4 note (Notes of Advisory Committee on Rules—1993 Amendment).  Plaintiffs have not done so, despite more than one year having passed since depositing documents with the Spanish authorities and more than fourteen months since initiation of this action.

The Clerk of Court is respectfully directed to terminate the motions at ECF Nos. 25 and 37.

SO ORDERED.

Dated: New York, New York
September 10, 2021

/s/ Kimba M. Wood
KIMBA M. WOOD
United States District Judge